UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>         Plaintiff,<br><br>    v.<br><br>ANDREW M. KOMAROW,<br><br>         Defendant. | C.A. No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows against Defendant Andrew M. Komarow ("Komarow" or "Defendant") and hereby demands a jury trial.

## SUMMARY

1. This action involves a $6.9 million "free-riding" securities trading scheme perpetrated by Komarow.

2. "Free-riding" is a fraudulent practice used by securities traders who seek to exploit the "immediate access" credit extended by certain broker-dealers in advance of incoming deposits of cash from bank accounts.

3. By seeking to transfer funds into his brokerage accounts from his bank accounts that he knew lacked sufficient funds to cover the transfers, Komarow exploited the "immediate access" credit extended by certain broker-dealers to buy and sell securities. Generally, immediate access at certain broker-dealers means that those broker-dealers will allow a customer to begin using deposited money immediately to place trades before the customer's check or electronic transfer from another financial account into their brokerage account has actually cleared.

1

Komarow carried out his scheme by trading in his brokerage account during the "immediate access" period when he knew he had insufficient funds in his bank account to cover the transfer into his brokerage account, and thus his brokerage account would never get the money to cover his trading activity. He attempted to earn and withdraw trading profits from his brokerage accounts before the broker-dealers were notified of the insufficient funds in his associated bank accounts and froze his brokerage accounts.

4. Specifically, between October 13, 2022 and January 30, 2023, (the "Relevant Period"), Komarow engaged in a free-riding scheme using his brokerage accounts at four different broker-dealers.

5. During the Relevant Period, Komarow knowingly, or at least recklessly, requested $6.9 million in deposits into 11 of his brokerage accounts at 4 broker-dealers, which were later reversed due to insufficient funds in the bank accounts from which he sought to transfer those funds. Before those fund transfers were reversed, Komarow was permitted by the broker-dealers to use some of those funds during the "immediate access" period to engage in speculative securities trading.

6. As a result of his speculative securities trades, Komarow made at least $615,031 in profits. Komarow withdrew those profits from his brokerage accounts at one broker-dealer.

7. Komarow's scheme left the four broker-dealers holding his brokerage accounts with losses totaling at least $3,352,407.

8. In addition, to open at least one of his brokerage accounts, Komarow made material misrepresentations in his brokerage account opening documents and deceptively used the access credentials (including username and password) of others to access the brokerage firm's online account systems.

9. By this conduct, Komarow violated, and unless enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

10. As the result of Komarow's violation, the Commission seeks permanent injunctive relief, a conduct-based injunction, an officer and director bar, disgorgement with prejudgment interest, and civil penalties against Komarow.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

12. The Defendant, directly or indirectly, made use of the mails, or the means or instrumentalities of transportation or communication in interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

13. Venue is proper in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] because Komarow resides in Connecticut and certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## THE DEFENDANT

14. Andrew M. Komarow, age 34, is a resident of Avon, Connecticut. From 2010 through the Relevant Period, Komarow was associated with a broker-dealer firm as a general securities principal and was associated with an investment advisory firm as an investment adviser representative. Komarow held multiple licenses issued by the Financial Industry Regulatory Association, including Series 6, Series 7, Series 63, and Series 65 licenses at various times.

## FACTS

**Komarow's Free-Riding at Broker-Dealer 1**

15.     Komarow opened a brokerage account with Broker-Dealer 1 in March 2013. On October 13, 2022, Komarow knowingly, or at least recklessly, made a $200,000 automated clearinghouse (or "ACH," a system of transferring funds electronically between financial institutions or accounts) deposit into his brokerage account at Broker-Dealer 1 from a bank account at Bank A that had less than $60,000 at the time of the requested transfer. Rather than waiting for the ACH transfer to clear, Broker-Dealer 1 allowed Komarow immediate access to the purportedly transferred funds to engage in securities trading. Komarow used that immediate access allowed by Broker-Dealer 1 to make a large number of high-risk trades intended to yield an immediate payoff in his brokerage account. Days later the ACH transfer was rejected for insufficient funds and reversed from Komarow's brokerage account at Broker-Dealer 1.

16.     Komarow knowingly, or at least recklessly, made three additional ACH transfers from his bank account at Bank A to his brokerage account at Broker-Dealer 1 on October 20 and 21, 2022, totaling $500,000. He again took advantage of the immediate access to those funds provided by Broker-Dealer 1 to make high-risk trades. Bank A later rejected these three requested ACH transfers for insufficient funds, as Komarow's Bank A account had less than $3,000 at the time he initiated each of the ACH transfers.

17.     At the time he engaged in the above free-riding activity, Komarow was associated with an investment advisory firm (the "Investment Adviser") as an investment adviser representative, where he managed clients' investment accounts and offered his clients advice on their accounts.

18. On or about October 25, 2022, Broker-Dealer 1 notified the Investment Adviser that there were problems with Komarow's personal brokerage account. The Investment Adviser learned that these problems included trades that were "not fully paid for." Broker-Dealer 1 also put restrictions on Komarow's brokerage account.

19. Komarow made multiple calls to Broker-Dealer 1 on November 8, 2022 and persuaded Broker-Dealer 1 to restore his access to his brokerage account. Komarow had already opened a new brokerage account at Broker-Dealer 1 on October 30, 2022, and from November 11 through November 14, 2022, Komarow opened six additional brokerage accounts at Broker-Dealer 1.

20. From November 10 through November 15, 2022, Komarow knowingly, or at least recklessly, made 10 ACH transfer requests totaling $2.5 million into all 8 of the brokerage accounts he had opened by November 14, 2022. These ACH transfer requests, all for $250,000 each, were all made from a bank account at Bank A that had less than $4,000 at the time of the requests. Komarow again used the immediate access to those funds provided by Broker-Dealer 1 to make high risk trades. Bank A later rejected all 10 of Komarow's ACH transfer requests for insufficient funds.

21. On November 17, 2022, Komarow knowingly, or at least recklessly, made 3 ACH transfer requests totaling $400,000 from a second bank account at Bank A that had less than $45,000 at the time and again directed those funds to his brokerage accounts at Broker-Dealer 1. He again used those funds to execute high risk securities trades. Bank A later rejected all 3 of the ACH requests for insufficient funds.

22. Due to Komarow's continued free-riding activity, Broker-Dealer 1 restricted Komarow's access to his brokerage accounts and also to the accounts of his advisory clients at

the Investment Adviser. Broker-Dealer 1 expressed that Komarow's activity violated trading rules.

23. On the evening of November 17, 2022, Komarow was informed by the Investment Adviser that his employment was being terminated, effective immediately, due to the activity in his personal brokerage account at Broker-Dealer 1. Not only were Komarow's trades high-risk, but his activity in his personal brokerage account at Broker-Dealer 1 also adversely impacted his advisory clients at the Investment Adviser because Broker-Dealer 1 prevented Komarow from accessing any of his advisory client accounts that were held at Broker-Dealer 1.

24. From October 14, 2022 through November 15, 2022, Komarow withdrew at least $615,031 in profits from his brokerage accounts at Broker-Dealer 1.

25. Combined, Komarow's 8 brokerage accounts with Broker-Dealer 1 had negative account balances totaling $264,656 when they were restricted. Komarow's conduct thus caused Broker-Dealer 1 to incur losses of at least $264,656.

**Komarow's Attempted Free-Riding at Broker-Dealer 2**

26. Komarow had a brokerage account with Broker-Dealer 2, which he opened in January 2017.

27. On November 29, 2022, Komarow requested an ACH transfer of $20,000 to his brokerage account at Broker-Dealer 2 from Bank B, where he had less than $14,000 in his bank account.

28. Broker-Dealer 2 did not give Komarow immediate access to the funds Komarow had attempted to deposit, but instead put the deposit on hold until December 5, 2022.

29. Bank B rejected Komarow's ACH transfer request for insufficient funds on December 3, 2022.

30. Komarow was not able to make any securities trades using his attempted ACH deposit at Broker-Dealer 2.

**Komarow's Free-Riding at Broker-Dealer 3**

31. Komarow had been associated with Broker-Dealer 3 as a general securities principal since April 2016. As a general securities principal, Komarow was permitted to buy and sell securities for his brokerage customers through Broker-Dealer 3, where he was also authorized to supervise other Broker-Dealer 3 representatives.

32. On November 21, 2022, as a result of his activity at Broker-Dealer 1 and his termination from the Investment Adviser, Broker-Dealer 3 informed Komarow that if he did not find another investment adviser to work with in the next thirty days, his employment with Broker-Dealer 3 would also be terminated.

33. On November 30, 2022, Komarow opened his own personal brokerage account at Broker-Dealer 3. The brokerage account opening documentation included a form allowing him to make ACH deposits and another form allowing him to make options trades. Options are a trading strategy that can be used for speculative, high-risk trading. Komarow opened his brokerage account and completed these forms online, using the access credentials of two of his firm's employees.

34. When opening his personal brokerage account at Broker-Dealer 3, Komarow falsely represented that his liquid net worth was over $1 million to obtain the ability to do options trading. In an "SWM Option Agreement and Disclosure Document," which required its completion in full to allow options trading, Komarow selected the highest option for his liquid net worth in completing the form. Komarow electronically signed the form on November 30, 2022. When signing, Komarow certified that the information in the form was "true and correct."

Using the access credentials of one of his employees, he electronically signed the form with that employee's name as well on November 30, 2022.

35.    Komarow made an initial $100 ACH deposit to his brokerage account at Broker-Dealer 3 from his bank account at Bank B, for which he had available funds. On the next day, December 1, 2022, Komarow knowingly, or at least recklessly, requested a $400,000 ACH transfer and then knowingly, or at least recklessly, requested a separate $2 million ACH transfer from his bank account at Bank B to his new brokerage account at Broker-Dealer 3. Komarow's bank account at Bank B had $100 in it at the time he requested these $2.4 million in transfers. Komarow took advantage of the fact that Broker-Dealer 3 would allow him immediate access to funds purportedly deposited through these ACH transfers by placing high-risk securities options trades intended to yield an immediate payoff in his brokerage account at Broker-Dealer 3.

36.    Broker-Dealer 3 attempted to contact Komarow regarding these trading activities on December 1, 2022. Komarow did not answer the calls from Broker-Dealer 3 personnel, but instead directed Employee A, a member of his staff who reported to Komarow and whose access credentials he had used to open the brokerage account, to speak to Broker-Dealer 3 personnel.

37.    Through electronic chats on the electronic communication platform known as Microsoft Teams, Komarow instructed Employee A to tell Broker-Dealer 3 personnel that she had initiated the trades Broker-Dealer 3 was calling about, when in fact Komarow had placed the trades using Employee A's credentials. When Broker-Dealer 3 personnel asked if there was more money coming into the brokerage account, Komarow instructed Employee A to "say more than he needs, say 900k." This message illustrates that Komarow was aware that the money to pay for these trades was not yet in Komarow's brokerage account.

38. Later the same day, Komarow offered Employee A a monetary bonus to get Broker-Dealer 3 to execute the trades that Komarow had made with his purported ACH deposits. Komarow told Employee A via Microsoft Teams: "lie, whatever you have to do, to get those trades placed." Although Broker-Dealer 3 personnel cancelled some of the trades Komarow had requested, many of Komarow's trades were executed after Broker-Dealer 3 personnel spoke to Employee A.

39. The next day, December 2, 2022, Komarow knowingly, or at least recklessly, requested a $600,000 ACH transfer from his bank account at Bank B, which had a $0 balance at the time, to his brokerage account at Broker-Dealer 3. Komarow again used the immediate access that Broker-Dealer 3 provided to those funds to make high risk securities trades.

40. All three of Komarow's ACH transfer requests to Broker-Dealer 3, totaling $3 million, were ultimately rejected by Bank B for insufficient funds.

41. By December 5, 2022, Broker-Dealer 3 put restrictions on Komarow's brokerage account.

42. By December 5, 2022, Komarow's brokerage account at Broker-Dealer 3 had a negative balance of $3,087,020. Komarow's free-riding scheme thus left Broker-Dealer 3 to incur a loss of at least $3,087,020.

43. On December 5, 2022, Broker-Dealer 3's Compliance Department emailed Komarow. The Compliance Department gave Komarow "the opportunity to confirm" that he "knowingly submitted ACH instructions without the sufficient funds to cover the transactions that were ultimately placed in that account." Komarow responded via email: "I don't have the funds. I do not know what I was thinking when this happened."

44. On December 6, 2022, Komarow was notified of the immediate termination of his employment from Broker-Dealer 3.

**Komarow's Free-Riding at Broker-Dealer 4**

45. Komarow opened a brokerage account with Broker-Dealer 4 in September 2010.

46. On January 27, 2023, Komarow knowingly, or at least recklessly, requested an ACH transfer of $30,000 to his brokerage account at Broker-Dealer 4 from his bank account at Bank B. At the time of his request, Komarow had less than $1,000 in available funds in his bank account at Bank B. Bank B rejected the transfer for insufficient funds.

47. Before Bank B rejected the transfer, Komarow took advantage of the fact that Broker-Dealer 4 gave him immediate access to the funds he had purported to transfer to his brokerage account. Komarow executed one large and unprofitable securities trade, which left a negative balance of $730 in his brokerage account at Broker-Dealer 4. Komarow's free-riding scheme thus left Broker-Dealer 4 to incur a loss of $730.

48. On January 30, 2023, Komarow knowingly, or at least recklessly, requested an ACH transfer of $250,000 to his brokerage account at Broker-Dealer 4 from his bank account at Bank B. Komarow had less than $5,000 in his bank account at Bank B at the time he requested this transfer.

49. Broker-Dealer 4 had placed restrictions on Komarow's brokerage account after his previous deposit was rejected for insufficient funds, and Komarow was not able to make any trades using this purported $250,000 ACH deposit, which was ultimately rejected by Bank B for insufficient funds.

\*          \*          \*

50.     In total during the Relevant Period, Komarow requested 23 ACH transfers totaling $6.9 million that were rejected by his banks for insufficient funds, as shown in the chart below:

| Institution | Date of ACH | Amount of ACH | Available Bank Account Balance* *At beginning of day |
|---|---|---|---|
| Broker-Dealer 1 | 10/13/22 | $200,000 | $57,492.08 |
| Broker-Dealer 1 | 10/20/22 | $200,000 | $874.86 |
| Broker-Dealer 1 | 10/20/22 | $50,000 | $874.86 |
| Broker-Dealer 1 | 10/21/22 | $250,000 | $2,003.37 |
| Broker-Dealer 1 | 11/10/22 | $250,000 | $3,492.70 |
| Broker-Dealer 1 | 11/10/22 | $250,000 | $3,492.70 |
| Broker-Dealer 1 | 11/14/22 | $250,000 | $3,492.70 |
| Broker-Dealer 1 | 11/14/22 | $250,000 | $3,492.70 |
| Broker-Dealer 1 | 11/14/22 | $250,000 | $3,492.70 |
| Broker-Dealer 1 | 11/14/22 | $250,000 | $3,492.70 |
| Broker-Dealer 1 | 11/14/22 | $250,000 | $3,492.70 |
| Broker-Dealer 1 | 11/14/22 | $250,000 | $3,492.70 |
| Broker-Dealer 1 | 11/15/22 | $250,000 | $3,492.70 |
| Broker-Dealer 1 | 11/15/22 | $250,000 | $3,492.70 |
| Broker-Dealer 1 | 11/17/22 | $100,000 | $44,194.17 |
| Broker-Dealer 1 | 11/17/22 | $200,000 | $44,194.17 |
| Broker-Dealer 1 | 11/17/22 | $100,000 | $44,194.17 |
| *Total Broker-Dealer 1* | | *$3,600,000* | |
| | | | |
| Broker-Dealer 2 | 11/29/22 | $20,000 | $13,972.94 |
| *Total Broker-Dealer 2* | | *$20,000* | |
| | | | |
| Broker-Dealer 3 | 12/1/22 | $2,000,000 | $100 |
| Broker-Dealer 3 | 12/1/22 | $400,000 | $100 |
| Broker-Dealer 3 | 12/2/22 | $600,000 | $0 |
| *Total Broker-Dealer 3* | | *$3,000,000* | |
| | | | |
| Broker-Dealer 4 | 1/27/23 | $30,000 | $809.51 |
| Broker-Dealer 4 | 1/30/23 | $250,000 | $4,814.29 |
| *Total Broker-Dealer 4* | | *$280,000* | |
| | | | |
| **Total All Broker-Dealers** | | **$6,900,000** | |

51. Broker-Dealers 1, 3, and 4 were left with negative account balances, and thus losses, as a result of Komarow's free-riding scheme. These negative balances totaled at least $3,352,407.

52. In addition to causing losses to Brokers-Dealers 1, 3 and 4 as part of his fraudulent scheme, Komarow withdrew $615,031 in trading profits to which he was not entitled because he earned those proceeds from trades that he did not have the money to make.

53. At all times in the Relevant Period when placing the trades referenced above, Komarow knew, or was reckless in not knowing, that the deposits he had purported to make were insufficient to cover the costs of the trades he placed.

## COUNT 1 – FRAUD BY DEFENDANT KOMAROW

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]**

54. Paragraphs 1 through 53 are hereby realleged and are incorporated herein by reference.

55. By reason of the conduct described above, Defendant Komarow, directly or indirectly, in connection with the purchase and sale of securities, by the use of the means or instrumentalities of interstate commerce or by use of the mails, intentionally, knowingly or recklessly:

    a. Employed devices, schemes, or artifices to defraud;

    b. Made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon any persons, including purchasers or sellers of such securities.

56.     By reason of the foregoing, Defendant Komarow violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays that the Court:

A.      Enter a permanent injunction enjoining Defendant Komarow, and his agents, servants, employees, attorneys, and all persons in active concern or participation with them who receive actual notice of the order by personal service or otherwise, including facsimile transmission, email or overnight delivery service, from violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

B.      Issue an order, pursuant to Sections 21(d)(1) and/or 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(1), (3)], that permanently enjoins Defendant Komarow from: (a) directly or indirectly, trading securities in any brokerage account he owns, controls, or has access to that does not have settled cash equal to or greater than the amount of the securities trade(s); and (b) opening a brokerage account without first providing to the relevant brokerage firm(s) a copy of the Commission's filed complaint in this matter and any judgment that the Commission may obtain against him in this matter.

C.      Issue an order, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], that Defendant Komarow be prohibited from acting as an officer or director of any public company.

D.      Require Defendant Komarow to disgorge all ill-gotten gains he received as a result of his violation of the federal securities laws, plus pre-judgment interest thereon;

E. Require Defendant Komarow to pay a civil monetary penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

F. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

G. Grant such other and further relief as this Court may deem just, equitable, and appropriate.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Dated: December 8, 2023

Respectfully Submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

/s/ Kathleen B. Shields
Kathleen B. Shields (Mass. Bar No. 637438)
Cassandra H. Arriaza (Mass. Bar No. 669806)
David R. Fox (Virginia Bar No. 93500)
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
ShieldsKa@SEC.gov
Shields phone: (617) 573-8904
Facsimile: (617) 573-4590

Local Counsel:
/s/ David C. Nelson
David C. Nelson
Assistant United States Attorney
United States Attorney's Office
District of Connecticut
157 Church Street
New Haven, CT 06510
(203) 821-3700
David.C.Nelson@usdoj.gov